Floyd Allen MEDLOCK, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. C–91–298.

Court of Criminal Appeals of Oklahoma.

Sept. 30, 1994.

Rehearing Denied Feb. 9, 1995.

Steven Jones, Robert Wyatt, IV, Enid, for defendant, at trial.

Cathy Stocker, Dist. Atty., Enid, Michael Gahan, Asst. Dist. Atty., El Reno, for State, at trial.

William H. Luker, Deputy Appellate Indigent Defender, Norman, for appellant, on appeal.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for appellee, on appeal.

## OPINION

CHAPEL, Judge:

Floyd Allen Medlock was charged by Amended Information in Canadian County District Court, Case No. CRF–90–89, with First Degree Murder with Malice Aforethought or, in the alternative, First Degree Murder While in Commission of a Felony, in violation of 21 O.S.Supp.1989, § 701.7. The State filed a Special Bill of Particulars seeking the death penalty. The Bill of Particulars alleged (1) the murder was especially

heinous, atrocious or cruel, and (2) there existed the probability that Medlock would commit criminal acts of violence that would constitute a continuing threat to society.[1]

On February 4, 1991, Medlock entered a blind plea of guilty[2] to First Degree Murder with Malice Aforethought. The Honorable Edward C. Cunningham conducted a hearing to determine the voluntariness and sufficiency of the plea. The district court found Medlock was competent to enter the plea, the plea was being entered knowingly and voluntarily, and there was a factual basis for the plea. The district court accepted Medlock's guilty plea.

A sentencing hearing was held from March 11 through 15, 1991. At the conclusion of the hearing, the district court found the existence of both aggravating circumstances alleged in the Bill of Particulars, determined the aggravating circumstances outweighed the mitigating circumstances and imposed a sentence of death. Before the death sentence was formally pronounced, Medlock filed an application to withdraw his guilty plea. The district court overruled Medlock's application and imposed the death sentence. Medlock filed a writ of certiorari with this Court appealing both the district court's order denying his application to withdraw his guilty plea and his death sentence. We now affirm Medlock's Judgment and Sentence.

## FACTS

On the night of February 19, 1990, Georgina Busch reported that her seven-year-old daughter, Katherine Ann Busch (hereinafter referred to as Kathy), was missing. During the early morning hours of February 20, 1990, the police found Kathy's dead body in a dumpster behind a shopping center store near the apartment complex where Kathy lived with her mother. An autopsy revealed Kathy died from a deep stab wound in the back of her neck. Kathy's face and body had sustained a number of injuries, bruises and abrasions, including injuries to the vagina and rectum.

At approximately 9:30 a.m. on February 20, Floyd Allen Medlock, who was not a suspect in Kathy's murder, called "911" from a public telephone booth and informed the Yukon police dispatcher that he was the person who had killed the young girl. Medlock gave the dispatcher his location and a description of himself. The Yukon police responded to the call and arrested Medlock. After his arrest, Medlock confessed to killing Kathy Busch.[3]

Medlock had been living in the same apartment complex as Kathy and her mother for approximately two weeks. In his oral confession to the Yukon police, Medlock stated that, at 3:30 p.m. on the day Kathy was killed, he was in his apartment watching cartoons when he heard someone trying to open his door. Medlock unlocked the door and saw a little girl with a bicycle.[4] Medlock said the girl walked into his apartment and told him she used to live there. Medlock advised the child she should not barge into his home. The girl asked Medlock to feed her and he offered to make her macaroni and cheese. While making the macaroni and cheese, Medlock gave the girl some chips for a snack.

1. 21 O.S.Supp.1987, § 701.9, 21 O.S.1981 § 701.12.

2. A "blind" plea of guilty is a plea in which there is no binding agreement on sentencing, and punishment is left to the judge's discretion.

3. Medlock confessed on video-tape and in writing. Medlock gave a video-tape confession to the Yukon police on February 20, 1990, shortly after his arrest. Medlock also provided a written confession to the Yukon police on February 20. On February 21, 1990, the F.B.I. conducted a video-taped interview with Medlock. During the F.B.I. interview, Medlock discussed his childhood, his views on various issues, and his thoughts about Kathy's murder. Both video-tapes and the written confession were admitted into evidence during the sentencing hearing without objection. On appeal, Medlock does not challenge the admissibility of these confessions and admissions.

4. There are some discrepancies between the statements Medlock gave to the Yukon police and the F.B.I. For example, in his interview with the F.B.I., Medlock stated that, at his suggestion, the little girl brought the bicycle into his house. (State Exhibit 70 at 38)

Medlock stated that as he was cooking the macaroni and cheese "this real weird feeling" came over him. (P.H. State Exhibit 10 at 21)[5] Initially Medlock told the Yukon police that the girl told him she did not want macaroni and cheese and went into Medlock's bedroom. Later during his confession, Medlock stated the child went into the bedroom with him. In his written confession, Medlock stated that "[f]or some reason [he] thought that the girl should die," and when he went into his bedroom to get a knife, the child followed him. (State Exhibit 61) Medlock said the girl told him that she and her mother used to use the bedroom. Medlock stated "I said, oh yeah? And then she said, Yeah. And then I—then I grabbed her by the arm and she jerked her arm away, and I grabbed her again, and she jerked away again." (P.H. State Exhibit 10 at 6)

Medlock wrestled with the girl, covered her mouth when she began screaming, and choked the child until she passed out. He then dragged her over to the toilet and stuck her head in the toilet for ten minutes during which time the child was still gasping for air. At one point during his confession, Medlock stated the girl was still conscious when he put her head in the toilet.[6] (P.H. State Exhibit 10 at 28) When it was evident the child was still alive even after he had held her head in the toilet, Medlock stabbed the child in the back of the neck with a knife but the knife broke. He then used a hunting knife to stab the girl in the back of the neck again.[7] According to the medical examiner, this stab wound killed Kathy. Medlock then held the child's head in the toilet so that she

would not bleed on the floor. When the bleeding stopped, he put the body in the bathtub and took off the child's clothes. Medlock tried to sexually molest the child but could not sustain an erection. He wrapped the child in a blanket, placed her in a box, and took the child's body and her bicycle to the dumpster.

Medlock told the police the whole incident seemed dream-like and he had difficulty remembering the incident. He said he could not believe what he had done and stated he threw up after he "did it." (P.H. State Exhibit 10 at 10) Medlock advised the Yukon police that he had memory lapses and, when asked what caused him to snap, he mentioned voices he had been hearing since he was twelve-years-old.

Medlock's account of the murder to the F.B.I. was similar to his confession to the Yukon police, although some details of the crime varied.[8] During his interview with the F.B.I., he discussed the voices he heard during the murder and stated the voices stopped after the girl was dead. He described the incident as dream-like and stated "I was sunk back, and it was someone else, you know, in front doing this." (State Exhibit 70 at 45)

Medlock initially pleaded not guilty by reason of insanity. Immediately prior to empaneling the jury for trial, he advised the district court he wished to enter a blind plea of guilty to First Degree Murder with Malice Aforethought. Before accepting the plea, the trial court placed Medlock under oath and questioned him about his competence to en-

---

5. The State admitted as State's Exhibit 60 Medlock's February 20 video-taped confession. This video-tape was transcribed at the January 31, 1991 preliminary hearing and the transcript was admitted at the preliminary hearing as State's Exhibit 10.

 During the February 21 F.B.I. interview, Medlock stated he wanted to tell the little girl to leave because he feared he would hurt her. See State Exhibit 70 at 39 (transcript of video-tape statement to F.B.I.)

6. In his written confession, Medlock stated that the child was unconscious when he dragged her to the toilet. During his statement to the F.B.I.,

Medlock stated that the child was still conscious when he dragged her to the toilet and that she was saying "okay, okay" while he was dragging her to the toilet. (State Exhibit 70 at 40) During the F.B.I. interview, Medlock said the girl passed out after he held her head in the toilet, but he could still hear her breathing.

7. Medlock also stated he stabbed the girl in the eye, but this statement was inconsistent with the medical examiner's report.

8. See supra at nn. 3–6.

ter the plea, the voluntariness of the plea, the consequences of entering the plea, the various rights and presumptions he would waive by entering the plea, and about the facts of the case. Specifically, the district court asked Medlock:

THE COURT: Are you pleading guilty because you did the acts as charge [sic] and set forth in the information that I just read to you?

MR. MEDLOCK: Yes, sir.

THE COURT: Are you pleading guilty of your own free will and without any coercion and compulsion of any kind?

MR. MEDLOCK: Yes, sir.

THE COURT: Have you been forced, abuse [sic], mistreated, threatened or promised anything by anyone to have you enter your plea today?

MR. MEDLOCK: No, sir.

THE COURT: Did you in fact take a four-inch dagger knife with a wooden type handle and stab Katherine Ann Busch, a minor child, on the 19th day of February, 1990?

MR. MEDLOCK: Yes, sir.

THE COURT: Was it your intent at that time to kill or terminate the life of Katherine Ann Busch?

MR. MEDLOCK: Yes, sir.

THE COURT: Do you contest that charge in anyway?

MR. MEDLOCK: No, sir.

THE COURT: In other words, do you disagree with what's set forth in the Information in any shape or form?

MR. MEDLOCK: No, sir.

THE COURT: At the time of the occurrence did you know that it was wrong for you to have done that?

MR. MEDLOCK: Yes, sir.

THE COURT: And did you know that you could be punished for that?

MR. MEDLOCK: Yes, sir.

(Feb. 4 Tr. 24–26) Further in support of Medlock's plea, the State incorporated the transcripts of the preliminary hearings held on June 22, 1990 and January 10, 1991. Medlock did not object to the incorporation of these hearings.

The trial court also questioned defense counsel about Medlock's competence to enter a guilty plea. Counsel stated that while he had some questions about Medlock's competency, he had been assured by a psychologist and a social worker that Medlock was competent. The trial court then asked:

THE COURT: Mr. Jones, do you have any reason to believe your client was not mentally competent to appreciate and understand the nature, purposes and consequences of his acts at the time they were committed and out of which the charge of Murder In The First Degree as set forth in the Information arose?

MR. JONES: I do not believe that there is sufficient evidence to indicate that Mr. Medlock was insane as defined by the laws of the State of Oklahoma at the time the offense was committed.

(Feb. 4 Tr. at 17)

After questioning Medlock and his counsel, the district court concluded he was competent to enter the plea and was entering the plea knowingly and voluntarily. The district court found Medlock "was mentally competent to appreciate and understand the acts he committed on or about the date of February 19th, 1990" and he "was competent to realize the nature, purposes and consequences of those acts at the time that they were committed." (Feb. 4 Tr. at 28) Based upon these findings and the evidence presented at the hearing, the district court accepted Medlock's guilty plea. The district court set the case for sentencing.

At the sentencing hearing, the State presented evidence regarding Kathy's murder and evidence of Medlock's prior convictions to support the two aggravating circumstances charged in the Bill of Particulars. The State's evidence included Medlock's

statements to the police and F.B.I., and the testimony of the medical examiner who performed the autopsy of Kathy.

In mitigation, Medlock presented several expert witnesses: Marsha Radcliff, a licensed clinical social worker; Dr. Melvyn Price, a professor of psychology at Oklahoma City University; and Dr. Bernaer Newton, a retired clinical psychologist, who specialized in multiple personality disorders.

Multiple personality disorder ("MPD") is a disassociative mental disorder [9] in which several personalities or ego states are embodied in one individual.[10] According to Dr. Newton, in some MPD cases, the various personalities or egos that inhabit a person's body are unaware of one another and do not know what the other personalities do. In other cases, the various personalities are aware of each other and, to a certain extent, may experience, on some level, the actions and activities of the other personality.

Medlock's defense experts concluded Medlock was suffering from MPD with atypical features. Their opinions were that Medlock

9. "A dissociative disorder is a 'disturbance or alteration in the normally integrative functions of identity, memory, or consciousness.'" E.R. Saks, *Multiple Personality Disorder and Criminal Responsibility*, 25 U.C. Davis L.Rev. 383, 392 n. 25 (1992), quoting, *The American Psychiatric Press Textbook of Psychiatry* 220 (John A. Talbott et al. eds., 1988).

10. This Court has not yet dealt with a case involving MPD. However, in a civil proceeding concerning whether a statute of limitations should be tolled due to memory loss caused by MPD, the Oklahoma Supreme Court examined MPD and described that mental disability as follows:

the existence within the person of two or more distinct personalities or personality states. Personality is here defined as a relatively enduring pattern of perceiving, relating to, and thinking about the environment and one's self that is exhibited in a wide range of important social and personal contexts. Personality states differ only in that the pattern is not exhibited in as wide a range of contexts. In classic cases, there are at least two fully developed personalities; in other cases, there may be only one distinct personality and one or more personality states. In classic cases, the personalities and personality states each have unique memories, behavior patterns, and social relationships; in other cases, there may be varying degrees of sharing of memories and commonalities in behavior or social relationships.... At lease [sic] two of the personalities, at some time and recurrently, take full control of the person's behavior. The transition from one personality to another is usually sudden (within seconds to minutes), but, rarely, may be gradual (over hours and days).... A transition may also be elicited by hypnosis or an amobarbital interview. Often personalities are aware of some or all of the others to varying degrees, and some may experience the others as friends, companions, or adversaries. Some personalities may be aware of the exis-

tence of other personalities, but not have any direct interaction with them. Some may be unaware of the existence of the other.... One or more of the personalities may function with a reasonable degree of adaption (e.g., be gainfully employed) while alternating with another personality that is clearly dysfunctional or appears to have a specific mental disorder.... Each personality displays behaviors characteristic of its sense of its stated age.
*Lovelace v. Keohane*, 831 P.2d 624, 631 (Okl. 1992), quoting, American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders § 300.14, at 269–270 (3d ed. rev. 1987) (DSM–III–R).

MPD often arises out of early childhood trauma, particularly sexual and physical abuse or neglect and abandonment. J. Franklin, *The Diagnosis of Multiple Personality Disorder Based on Subtle Dissociative Signs*, 178 J. of Nervous and Mental Disease 4 (1990); P.M. Coons, E.S. Bowman & V. Milstein, *Multiple Personality Disorder*, 176 J. of Nervous and Mental Disease 519 (1988). "[T]he basic idea is that, in the face of overwhelming trauma, the patient creates a new personality to handle the trauma; 'she herself' does not experience it. Often the patient will have several personalities that reflect alternative ways of coping with a difficult issue or problem." Saks, *supra*, at 395 (footnote omitted). MPD sufferers may experience headaches, amnesia, depression, and auditory hallucinations. Coons, Bowman & Milstein, *supra*; M. Boor, *The Multiple Personality Epidemic: Additional Cases and Inferences Regarding Diagnosis, Etiology, Dynamics, and Treatment*, 170 J. of Nervous and Mental Disease 302 (1982).

The diagnosis of MPD is not without controversy. Some commentators question the validity of MPD. Other skeptics recognize the existence of MPD, but contend it is much rarer than suggested by proponents. Coons, Bowman & Milstein, *supra*. While many MPD sufferers do not commit criminal acts, commentators have advised caution in applying MPD in criminal cases because some individuals will try to use the MPD

has two personalities or ego states. The primary personality is Allen. Allen is the personality that is usually in control and Allen is the personality that called the police and turned himself in for Kathy Busch's murder. Allen's alter-personality is "Charley," a twelve-year-old boy. According to defense experts, the barrier between Allen and Charley "fluctuates considerably from time to time," and both personalities are aware of one another. (Mar. 13 Tr. at 186) According to Dr. Newton, at times when Charley takes control Allen will experience Charley's actions "in kind of a dream-like state that also fluctuates from total blackout in a given moment to quite intense awareness at another moment and then a very hazy kind of awareness in between." (Mar. 13 Tr. at 187)

Medlock's experts maintained that Charley was in control at the time of Kathy's murder and Allen was unable to stop or control Charley's actions. When Allen was cooking the macaroni and cheese, he "snapped" and Charley took control. According to Dr. Price, Allen observed much of the crime. Dr. Price testified "Allen reported he could see everything that happened except for when he thinks he blacked out, but he was unable to stop it." (Mar. 13 Tr. 49) Apparently, according to Dr. Price, during the murder Allen experienced intermittent periods where he blacked out or faded out and periods when he could observe what was happening. Medlock's witnesses also concluded that at the time of Kathy's murder, Charley suffered from the delusion that Kathy was his abusive step-father, Norm. According to Medlock's experts, Charley thought he was killing his abusive step-father and not Kathy. Medlock's witnesses stated in their report that initially Allen was unaware of Charley's delusion that Kathy was the abusive step-father, Norm.

Medlock presented a video-tape of a hypnotic session with Dr. Newton in which both Allen and Charley spoke and discussed Kathy's murder. Dr. Price testified MPD is treatable and Medlock's prognosis, if he received proper therapy, was good.

In rebuttal, the State called Dr. Stanton Samenow, a clinical psychologist. Dr. Samenow testified essentially that he did not see any evidence that would rule out a finding that Medlock was not malingering and believed the inconsistencies in Medlock's statements raised doubts about his credibility. Samenow also thought Medlock displayed a pattern of escalating anti-social behavior culminating in the murder of Kathy Busch. Although Dr. Samenow reviewed Medlock's statements to the police and F.B.I., and reviewed mental health reports, he did not personally interview or examine Medlock. Dr.Samenow also testified that in his experience he had never seen a valid case where an individual was actually insane at the time of the commission of his crime.

At the conclusion of the sentencing hearing, the trial court found the existence of both aggravating circumstances. Upon concluding the aggravating circumstances outweighed the mitigating circumstances, the trial court imposed the sentence of death.

## ISSUES RELATING TO GUILTY PLEA

In his first proposition of error, Medlock makes four separate arguments [11] to support his contention that the trial court erred in refusing to grant his application to withdraw his guilty plea. Medlock does not contend he was mentally incompetent to enter the plea. Rather, his primary attack on the guilty plea centers around the factual sufficiency of the plea.

 Prior to entering his guilty plea, Medlock stated, in response to the trial court's questions, that he intended to kill Kathy, he did in fact kill Kathy, and he knew

diagnosis to escape responsibility for their crimes. *Id.* at 524–525.

11. Proposition I is divided into four sub-parts. In sub-proposition A, Medlock argues there was an insufficient factual basis to support the plea.

In sub-proposition B, Medlock argues the record does not show he waived his right against self-incrimination. Sub-proposition C raises the contention that Medlock did not waive his right to sentencing by a jury. And, in sub-proposition D, Medlock seeks an evidentiary hearing to explore

at the time of the murder that it was wrong to kill Kathy. Medlock does not contend he was incompetent when he made these admissions. Instead, Medlock contends the extensive evidence on MPD presented at sentencing undermined the factual sufficiency of his guilty plea by raising significant doubts about Medlock's sanity at the time of Kathy's murder,[12] or alternatively, this evidence raised doubts about whether Medlock possessed the requisite intent to kill. On this basis, Medlock asserts the district court should have ordered sua sponte the withdrawal of his plea.

 Medlock did not raise the issue of factual sufficiency in his application to withdraw his plea. Failure to raise the issue in the application to withdraw constitutes a waiver of the issue.[13] Thus, this Court will review for plain error only. An examination of the record before this Court reveals the district court did not commit plain error by failing to order *sua sponte* the withdrawal of Medlock's guilty plea.

In *Berget v. State,*[14] a capital case in which the appellant entered a blind plea of guilty, this Court held that in determining the factu-

al sufficiency of the plea, the trial court may look at the entire record before it, including the capital sentencing proceedings. The Court noted:

> It is important to recognize that the court's ability to consider that entire record when determining whether to accept a guilty plea is a double edged sword. Just as the record may be used to establish the factual basis, it may also indicate to the trial court that some element of the crime is lacking. In such a situation, the trial court has an obligation not to accept the plea, notwithstanding the claims of the defendant during the actual plea proceedings, and refuse to sentence the defendant on the plea.[15]

Relying on *Berget,* Medlock argues the trial court was obligated to order the withdrawal of Medlock's guilty plea once it heard the evidence of Medlock's mental disorder. The record does not support Medlock's argument.

As we stated in *Berget* the *entire* record may be considered when determining the factual sufficiency of the plea. Medlock focuses his attack on the factual sufficiency of the plea by concentrating entirely upon the

---

the advice counsel provided to Medlock regarding the decision to enter a blind plea of guilty.

**12.** Although a defendant is presumed sane, once a defendant raises sufficient doubt about his sanity, the burden shifts to the State to prove he is sane. *Walton v. State,* 744 P.2d 977, 979 (Okl.Cr. 1987). The insanity test under Oklahoma law is: A person is insane when that person is suffering from such a disability of reason or disease of the mind that he/she does not know that his/her acts or omissions are wrong and is unable to distinguish right from wrong with respect to his/her acts or omissions. A person is also insane when that person is suffering from such a disability of reason or disease of the mind that he/she does not understand the nature and consequences of his/her acts or omissions. *Pugh v. State,* 781 P.2d 843, 843–844 (Okl.Cr. 1989). Our insanity test is modeled after *M'Naghten,* 8 Eng.Rep. 718 (1843). Because MPD is recognized by the American Psychiatric Association as a mental illness, a defendant who suffers from MPD could use evidence of MPD to satisfy the mental illness prong of the insanity defense. However, a mental disability alone is insufficient to establish insanity at the time of the commission of the crime. *See*

*Wilson v. State,* 568 P.2d 1279, 1281 (Okl.Cr. 1977) ("It is not enough in a criminal trial for defendant to attempt to merely raise some doubt as to his emotional or mental instability ... [t]here must be other evidence or testimony to prove that defendant did not know right from wrong and that he could not appreciate the wrongfulness of his criminal act at the time he committed it"). Thus, a defendant must prove more than that he is suffering from MPD. The mental illness must be such that the defendant does not know that his/her acts or omissions are wrong and is unable to distinguish right from wrong with respect to his/her acts or omissions. Or, alternatively, the mental illness must be such that the defendant does not understand the nature and consequences of his/her acts or omissions. *See Pugh v. State,* 781 P.2d 843, 843–844 (Okl.Cr.1989).

**13.** 22 O.S.1991, Ch. 18, App., *Rules of the Court of Criminal Appeals,* Rule 4.1(A).

**14.** 824 P.2d 364, 370 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992).

**15.** *Id.* at 370.

testimony of Medlock's experts. However, as *Berget* made clear, the trial court is to look at "the substance of the entire record," which in Medlock's case includes a great deal more than simply the testimony of Medlock's three expert witnesses. In fact, in addition to the testimony of Medlock's expert witnesses, the record includes Medlock's statements at the plea hearing, his statements to the police and F.B.I., the presentence report, the evidence presented at the preliminary hearing, the medical examiner's report, Medlock's prior mental health records and the testimony of Dr. Samenow.

At the plea hearing, the district court questioned both Medlock and defense counsel about Medlock's competency to enter the plea and about Medlock's mental state at the time of the commission of the crime. Counsel assured the district court that mental health experts concluded that Medlock was both competent to enter the plea and that he was not insane at the time of the commission of the crime. Medlock, in response to questioning by the district court, admitted he killed Kathy, he intended to kill Kathy and advised the court he knew it was wrong to kill her. Medlock does not claim he was mentally incompetent to make such statements, under oath, to the trial court.

At the sentencing hearing, the State introduced Medlock's two video-taped confessions and one written confession. Medlock does not claim he was incompetent or in anyway coerced into making these confessions. Nor does Medlock dispute the accuracy of these confessions. In these confessions, Medlock describes the murder of Kathy in calm, specific detail.

When the district judge heard the evidence about Medlock's MPD during the sentencing hearing, he specifically asked one of the defense experts about Medlock's sanity and was advised that the defense experts, in conjunction with defense counsel, could not conclude Medlock was incompetent or insane. Coun-

sel also advised the court during sentencing that he did not think the evidence was sufficient to mount an insanity defense.

Medlock's experts did not claim that Medlock was insane at the time of the commission of the crime. To the contrary, Medlock's experts stated that while Medlock suffered from MPD and was not able to control the actions of "Charley" during the murder of Kathy, they did not find Medlock insane at the time of the commission of the crime. Other evidence presented at sentencing undermines Medlock's current claim that he was insane at the time of the commission of the crime. For example, Dr. Samenow could not rule out that Medlock was malingering. He said Medlock displayed a pattern of escalating anti-social behavior culminating in the murder of Kathy. Further, Medlock's confessions describing Kathy's murder in rather specific detail seemed to contradict the experts' contentions that Medlock "blacked out" or was unaware of some parts of Kathy's murder.

In contrast to Medlock's case is *Zakszewski v. State.*[16] In *Zakszewski*, this Court granted a writ of certiorari, *inter alia*, because there was not a factual basis for the defendant's guilty plea to feloniously carrying a firearm. At the plea hearing, the trial court asked only the most perfunctory questions regarding the factual basis of the plea. At sentencing, the defendant indicated he did not own the gun at issue and did not know a gun was in the car when he was arrested. There was no other evidence to support the factual basis of the plea. This Court found the trial court erred in not inquiring further to determine whether there was indeed a factual basis for the plea. In contrast, here there was ample evidence of guilt at the plea hearing. The trial court questioned a defense expert about the factual sufficiency at the sentencing hearing, and Medlock's experts stated that they did not find Medlock to be insane.[17]

█ Moreover, the district court gave consideration to Medlock's claims of mental ill-

**16.** 739 P.2d 544 (Okl.Cr.1987).

**17.** *See Frederick v. State,* 811 P.2d 601, 603–604 (Okl.Cr.1991) (evidence defendant may have been under influence of PCP at time of offense

ness and found he was not insane. In rendering Medlock's sentence, the judge stated, "I considered all other mitigating circumstances concerning the case, as well as the advanced theory on lingering doubt." (Mar. 15 Tr. at 102) The court found "[t]he evidence is that he was competent. That he was not insane under the laws of the state of Oklahoma." (Mar. 15 Tr. at 105) Whether a defendant is insane is a question of fact to be determined by the jury or the trier of fact and will not be disturbed on appeal when there is evidence supporting the finding.[18] Based on the record below, we find the evidence supported the trial court's conclusion that Medlock was not insane.

 While the evidence presented at the sentencing hearing may have given rise to some type of diminished capacity or other defense, the possibility that Medlock may have had a defense at trial does not undermine the validity or voluntariness of the plea.[19] Based on the record before this Court, the trial court did not abuse its discretion, nor did it commit plain error, when it did not order *sua sponte* the withdrawal of Medlock's guilty plea.[20]

 Medlock also attacks the sufficiency of the plea, by arguing the record does not show he waived his right against self-incrimination at the time of the plea. Medlock did not raise this issue in his application to withdraw his plea thus, waiving all but plain error.[21] A review of the plea hearing and the Plea Summary contained in the Original Record shows that Medlock was adequately advised of his right and his relinquishment of his right.[22] This argument is without merit.

 Medlock next contends the record does not show that he was informed of or waived his right to a jury in the punishment stage of the trial. Again Medlock did not raise this issue in his application to withdraw his plea thus, waiving all but plain error.[23] At the hearing and in the Plea Summary Medlock was informed generally of his right to a jury trial. Such advice comports with the requirements of *King v. State*.[24] Moreover, in his motion for an evidentiary hearing filed with this Court on June 14, 1993, Medlock attaches, as Exhibit A, a copy of a letter that defense counsel wrote to Medlock. In this letter, counsel discussed at length the pros and cons of proceeding with sentencing before a judge as opposed to sentencing before a jury. Counsel states in the letter that by withdrawing his plea of not guilty and entering a plea of guilty sentencing will be done by the trial judge. Medlock was adequately advised of his rights. Under these circumstances, this proposition is without merit.[25]

 In sub-proposition I.D., Medlock seeks an evidentiary hearing to discover the

---

not sufficient to undermine factual sufficiency of plea).

18. See *Clark v. State*, 718 P.2d 375, 378 (Okl.Cr. 1986) ("[o]n murder prosecution, the question of insanity at the time of the commission of the crime, presents a question of fact for the sole determination of the jury, and where there is any evidence tending to support the finding it is not the province of the appellate court to weigh the same") (citation omitted); *Jones v. State*, 648 P.2d 1251, 1257 (Okl.Cr.1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983); *O'Dell v. State*, 455 P.2d 750, 752 (Okl. Cr.1969); *Dare v. State*, 378 P.2d 339, 346 (Okl. Cr.1963).

19. *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Berget*, 824 P.2d at 370; *Frederick v. State*, 811 P.2d at 603–604.

20. *Allen v. State*, 821 P.2d 371, 375 (Okl.Cr.1991) (decision to withdraw plea is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion). See also *Estell v. State*, 766 P.2d 1380, 1384 (Okl.Cr.1988); *Brennan v. State*, 766 P.2d 1385 (Okl.Cr.1988).

21. 22 O.S.1991, Ch. 18, App., *Rules of the Court of Criminal Appeals*, Rule 4.1(A).

22. See *Ocampo v. State*, 778 P.2d 920 (Okl.Cr. 1989).

23. 22 O.S.1991, Ch. 18, App., *Rules of the Court of Criminal Appeals*, Rule 4.1(A).

24. 553 P.2d 529 (Okl.Cr.1976).

25. See generally *Worthen v. Meachum*, 842 F.2d 1179 (10th Cir.1988); *Ocampo, supra*.

advice that trial counsel provided Medlock concerning entry of his guilty plea. Medlock had the opportunity to conduct an evidentiary hearing at the time the district court considered his application to withdraw his guilty plea, but Medlock waived the hearing. We find an evidentiary hearing now is not warranted.[26]

### INEFFECTIVE ASSISTANCE OF COUNSEL

In Proposition II, Medlock contends trial counsel was ineffective by failing to attack the sufficiency and voluntariness of the plea in his application to withdraw his guilty plea. The United States Supreme Court in *Hill v. Lockhart*,[27] set out the standard for reviewing ineffective assistance of counsel claims in the context of guilty pleas:

> We hold ... that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel. In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson, supra,* [411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973)] and *McMann v. Richardson, supra,* [397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)]. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.[28]

Medlock contends his counsel was ineffective because he failed to attack the voluntariness of the plea in his application to withdraw his plea. Based on our review of the record, the plea was not involuntary and trial counsel was not ineffective for failing to raise an issue concerning the voluntariness of the plea. Medlock also fails to establish that but for counsel's alleged ineffective assistance Medlock would not have entered a guilty plea. Indeed, under the circumstances, the decision to enter a guilty plea seems a reasonable strategic choice. Accordingly, this proposition of error is without merit.

### ISSUES RELATING TO SENTENCING

In his third proposition of error, Medlock claims the sentencing court committed reversible error by considering convictions for nonviolent crimes as evidence that Medlock constituted a continuing threat to society. In the Bill of Particulars, the State listed the following evidence it intended to use in support of the continuing threat aggravating circumstance:

(1) all evidence introduced at trial regarding the murder of Katherine;

(2) Medlock's statements to the police that he surrendered because he would hurt someone in the future, and that he wanted to hurt people in the past, and his admissions regarding prior criminal conduct;

(3) incident involving indecent exposure in Nevada;

(4) second incident involving indecent exposure in Nevada;

(5) possession of marijuana in Nevada;

(6) burglary in Nevada; and

(7) arson in Nevada.

Prior to trial, the trial court struck allegations 3, 4 and 5 from the Bill of Particulars because these crimes did not involve acts of

---

**26.** *See* 22 O.S.Supp.1993, Ch. 18, App., *Rules of the Court of Criminal Appeals,* Rule 3.11.

**27.** 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

**28.** *Id.,* 474 U.S. at 58–59, 106 S.Ct. at 370, 88 L.Ed.2d at 210. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984) (to warrant reversal of conviction or sentence due to ineffective assistance of counsel, defendant must show (1) counsel's performance was so deficient that he was not functioning as the "counsel" as guaranteed by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense).

violence. On appeal, Medlock contends that consideration of the burglary and arson in Nevada was also improper. This claim is without merit.

■■■ While he was a juvenile, Medlock pleaded guilty to arson and burglary in Nevada. The evidence showed Medlock entered a neighbor's apartment, took certain items from the apartment and then set the apartment on fire. Although no one was injured, there was extensive property damage. Medlock contends that the arson and burglary are irrelevant on the issue of continuing threat because these crimes were nonviolent. Medlock's characterization of the crimes is not accurate. Although no one was injured as a result of the arson and burglary, the safety of others was potentially jeopardized by Medlock's conduct. These acts show a willingness and propensity on Medlock's part to engage in criminal behavior that puts other people at risk. In *Berget*,[29] this Court concluded evidence of prior crimes must "focus on only those crimes which indicate the likelihood of future violence." The arson and burglary are crimes which place the public in danger and demonstrate, in this case, a pattern of escalating criminal behavior that evidenced a probability that Medlock would commit future criminal acts of violence. These prior offenses were properly admitted to show Medlock constituted a continuing threat to society.[30]

■■■ In Proposition IV, Medlock asserts that the trial court committed reversible er-

ror in the sentencing phase of the proceedings by refusing to admit certain items of mitigating evidence, including letters from the defendant, that constituted evidence of his state of mind before the homicide and his remorse for the offense after the homicide. Specifically, Medlock contends the trial court erred in failing to admit Defendant's Exhibit 4—a letter in which Medlock begs for forgiveness and describes how miserable his childhood was—and Defendant's Exhibit 7—a letter addressed to Kathy's mother and the citizens of Yukon expressing remorse and asking for forgiveness for Kathy's murder.

Under *Lockett v. Ohio*[31] and *Eddings v. Oklahoma*[32] these letters are relevant mitigating evidence that should have been admitted. However, we find the evidence to be cumulative and conclude that Medlock was not harmed by the trial court's failure to admit the evidence.

■■■ Medlock also complains the trial court erred in not allowing Exhibit 8, a pamphlet from religious organizations opposed to capital punishment, to be admitted into evidence. This evidence did not relate to Medlock's character or the circumstances of the offense and did not offend the principles of *Lockett* and *Eddings*.[33] The trial court did not err by not admitting Exhibit 8.

■■■ In Proposition V, Medlock complains the sentencing court committed reversible error by allowing the State to rely upon

---

**29.** 824 P.2d at 375.

**30.** *See Malone v. State*, 876 P.2d 707 (Okl.Cr. 1994); *Hooks v. State*, 862 P.2d 1273, 1282–1283 (Okl.Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Trice v. State*, 853 P.2d 203, 220 (Okl.Cr.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Smith v. State*, 819 P.2d 270, 277 (Okl.Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2312, 119 L.Ed.2d 232, *reh. denied*, —— U.S. ——, 113 S.Ct. 11, 120 L.Ed.2d 939 (1992); *Boltz v. State*, 806 P.2d 1117, 1124 (Okl.Cr.1991), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991).

We refuse to adopt Medlock's argument that only criminal acts of violence which would be applicable to the "prior conviction of a violent crime" aggravating circumstance are relevant to

the question of continuing threat. This is not to say that evidence of any and all prior criminal convictions are admissible. The prior offenses must relate to and indicate whether there exists a probability that the defendant would commit future criminal acts of violence constituting a continuing threat to society. *See Malone*, 876 P.2d at 715–716.

**31.** 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

**32.** 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

**33.** *See Sellers v. State*, 809 P.2d 676, 688 (Okl.Cr. 1991), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991).

evidence not set forth in the Bill of Particulars. Medlock states that while the Bill of Particulars does not indicate that the sexual assault of Kathy would be used to prove the aggravating circumstances, the State relied on this evidence to support its burden of proof in sentencing. Medlock's argument is flawed, however, because he failed to object to the admission of this evidence on the grounds of lack of notice or to seek a continuance of the hearing when it became clear the State intended to .rely upon this evidence.

■ Failure to object to the admission of evidence not listed in the State's Bill of Particulars constitutes a waiver of that error.[34] In *Green v. State*,[35] this Court stated "[21 O.S.1981, § 701.10] together with Okla. Const. art. II, § 20, contemplates that a defendant in a capital murder case be provided with a summary of the evidence intended to support the alleged aggravating circumstances, and a list of the witnesses the State might call. However, we have recently held that this latter requirement, although constitutional in nature, may be waived by failure to timely raise the constitutional violation."

Here, in objecting to the evidence of the rape, trial counsel stated:

... there has been insufficient foundation laid as to whether these injuries occurred before death or after death. If they occurred after death, then they are not part of the res gestae of murder, and the offense that Mr. Gahan [the assistant district attorney] says occurred did not . in fact occur.

It might be relevant for some other purpose, but no other purpose has been laid before the Court or suggested in any of the pleadings. Therefore, I submit, since this is a hearing on aggravation, and the State is limited to the aggravating circumstances it has pled, *in the absence of a*

*foundation these injuries occurred during the life of Kathy Busch, then I object as they are irrelevant and immaterial.*

(Mar. 11th Tr. at 126) (emphasis added). This objection goes to foundation and relevance and not to the issue of notice. Further, in his application to withdraw his guilty plea, Medlock did not even mention the alleged "notice" problem.[36] Thus, any error due to deficiency in notice is waived.

*Jackson v. State*,[37] which is cited by Medlock, is distinguishable. There the defendant specifically objected to the lack of endorsement of witnesses and argued he was surprised and unprepared to continue. Jackson further asked for a continuance, which was denied. In contrast, Medlock contended that in the absence of a foundation the evidence was irrelevant. Moreover, Medlock did not seek a continuance until after sentencing and did not raise this issue in his application to withdraw his guilty plea. Under these circumstances, any error due to lack of notice is waived.

■ Medlock also contends that the trial court erroneously relied upon certain unadjudicated offenses that occurred in Florida but which were not set out in the Bill of Particulars. While the Bill does not specifically set out the alleged Florida offenses, the Bill does state that it would rely on Medlock's admissions regarding prior criminal conduct. The only evidence of the Florida offenses presented by the State appears in Medlock's videotape confession. Medlock had notice the confessions would be used in sentencing and he did not object to the admission of the statements. In addition, Medlock himself introduced evidence of the Florida crimes when his expert witnesses testified about Medlock's childhood and mental health history. Finally, the judge did not mention that he considered this evidence in determining

---

**34.** *Hayes v. State*, 845 P.2d 890, 893 (Okl.Cr. 1992).

**35.** 713 P.2d 1032, 1038 (Okl.Cr.1985), *overruled on other grounds, Brewer v. State*, 718 P.2d 354, 365–366 n. 1 (Okl.Cr.1986).

**36.** 22 O.S.1991, Ch. 18, App., *Rules of the Court of Criminal Appeals*, Rule 4.1(A).

**37.** 811 P.2d 614 (Okl.Cr.1991).

Medlock's sentence. As this evidence was included in the Bill of Particulars and there was no objection there was no error warranting relief.[38]

Medlock argues in his sixth proposition of error that the evidence was insufficient to prove either aggravating circumstances relied upon to support the sentence of death. Contrary to Medlock's contentions, the evidence supports the district court's finding of the existence of both aggravating circumstances.

To support a finding that a defendant committed a murder in an especially heinous, atrocious or cruel manner, the State must show the murder was preceded by torture or physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty.[39] Further, "[a]bsent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met."[40]

Medlock complains the State failed to present sufficient evidence of conscious physical suffering to support this aggravating circumstance. The question before this Court is whether, viewing the evidence in the light most favorable to the State, there is any competent evidence supporting this aggravating circumstance.[41] This Court's review of the evidence reveals that the evidence was sufficient to support the finding that Kathy was murdered in an especially heinous, atrocious or cruel manner.

In finding the State proved the existence of the especially heinous, atrocious or cruel aggravating circumstance, the trial court stated it had "specifically considered all the evidence and testimony to this case, as to the brutal beating, the rape and the anal sodomy ... the fact of the stabbing, or prior to that, the putting of the head into the toilet, the stabbing three times before the final, fatal wound after the Defendant had gotten the knife" (Mar. 15 Tr. at 96) Medlock confessed that Kathy was conscious when he hit her in the face, wrestled with her and tried to choke her. At one point during his confession to the Yukon police, Medlock stated that Kathy was conscious when he dragged her to the toilet and pushed her head into the toilet bowl. In his confession to the F.B.I., Medlock also admitted that Kathy was conscious as he dragged her to the toilet and then stuck her head into the toilet bowl in an attempt to drown her. This evidence is sufficient to show that the murder of Kathy was committed in an especially heinous, atrocious and cruel manner. The trial court, however, also relied on the evidence that Medlock sexually abused Kathy prior to her death. While there was evidence that Kathy was still alive when the sexual abuse occurred, there was no evidence Kathy was conscious while these acts occurred. Therefore, the evidence of the sexual abuse does not support this aggravating circumstance. Nonetheless, because there is other competent evidence to support the finding of this aggravating circumstance— i.e., beating Kathy about the face, choking Kathy, dragging Kathy to the toilet, shoving Kathy's face into the toilet bowl in an attempt to drown her, and holding Kathy's head in the toilet bowl for ten minutes during which time the child was still gasping for air—this Court finds that the trial court's finding that the murder was committed in an

**38.** I continue to adhere to the belief that it is inappropriate to use unadjudicated offenses to support the continuing threat aggravating circumstance. *See Paxton v. State,* 867 P.2d 1309, 1332–1336 (Okl.Cr.1993) (Chapel, J., dissenting).

**39.** *Hooks v. State,* 862 P.2d at 1282; *Romano v. State,* 847 P.2d 368, 387 (Okl.Cr.1993), *aff'd,* — U.S. —, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Hayes,* 845 P.2d at 892; *Berget,* 824 P.2d at 373;

*Stouffer v. State,* 742 P.2d 562, 563 (Okl.Cr.1987) (opinion on rehearing).

**40.** *Battenfield v. State,* 816 P.2d 555, 565 (Okl.Cr. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992). *See Stafford v. State,* 832 P.2d 20, 23 (Okl.Cr.1992).

**41.** *Romano,* 847 P.2d at 387; *Brogie v. State,* 695 P.2d 538, 542 (Okl.Cr.1985), *modified on other grounds,* 760 P.2d 1316 (Okl.Cr.1988).

especially heinous, atrocious or cruel manner is supported by the record.

█ Medlock also contends that the evidence was insufficient to support the continuing threat aggravating circumstance. This Court has upheld the continuing threat aggravating circumstance based on the defendant's criminal history,[42] the callousness of the crime,[43] and other factors, including threats against others,[44] lack of remorse,[45] and attempts to prevent calls to the police.[46] The touchpoint of this aggravating circumstance is whether the evidence shows there exists a probability that the defendant would commit future criminal acts of violence.

█ In finding Medlock constituted a continuing threat, the district court pointed to the following factors: (1) the murder happened in a brutal and callous manner; (2) Medlock's statements that he fears he will hurt someone in the future; (3) statements by Medlock regarding his sexual interest towards young children; (4) the efforts Medlock initially took to cover up the crime; (5) prior burglary and arson in Nevada; (6) a progression of anti-social behavior; and (7) Medlock's inability to control his own urges. (Mar. 15 Tr. 99–101) In addition, the trial court expressed its opinion that "I am satisfied that if the Defendant was ever released from prison, any women or young child on this street would be threatened by [Medlock's] inability to control his own personal urges." (Mar. 15 Tr. 101).

█ The evidence of the murder itself and Medlock's prior criminal history are sufficient to support the continuing threat aggravating circumstance.[47] However, we feel compelled to note that within the context of this case, Medlock's statement that he feared he would hurt someone in the future should not have been relied upon to find continuing threat. Rather, this evidence demonstrates Medlock's willingness and ability to remove himself from society to minimize his threat to society. This does not mean a statement of this type made within another context could not be utilized to support a finding of this aggravator. If this were the only evidence used to support the continuing threat aggravator, then that aggravating circumstance could not stand. It was not the only evidence used. Because of the evidence of the callousness of the crime and the prior convictions for arson and burglary, the finding that Medlock posed a continuing threat should stand.[48]

█ In Proposition VII, Medlock asserts that use of his statement regarding his fear of hurting others as evidence in aggravation as well as in mitigation deprived him of due consideration of mitigating evidence, and violated his rights accorded by the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution. We have already addressed the fact that we find Medlock's desire to prevent himself from hurting others should not have been used in aggravation. However, as the evidence was sufficient to support continuing threat we do not feel that relief is warranted. Further,

---

42. *Hooks,* 862 P.2d at 1282; *Boyd v. State,* 839 P.2d 1363, 1375 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993); *Berget,* 824 P.2d at 368; *Battenfield,* 816 P.2d at 566; *Boltz,* 806 P.2d at 1124.

43. *Hooks,* 862 P.2d at 1282–1283; *Berget,* 824 P.2d at 368; *Fowler v. State,* 779 P.2d 580, 588 (Okl.Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990).

44. *Revilla v. State,* 877 P.2d 1143 (Okl.Cr.1994); *Smith,* 819 P.2d at 278–279; *Green,* 713 P.2d at 1038–1039.

45. *Ellis v. State,* 867 P.2d 1289, 1302 (Okl.Cr. 1992).

46. *Smith,* 819 P.2d at 278–279. *See generally Malone,* 876 P.2d at 715–716.

47. *See generally Malone,* 876 P.2d at 715–716; *Snow v. State,* 879 P.2d 150 (Okl.Cr.1994); *Hooks,* 862 P.2d at 1282–1283; *Boltz,* 806 P.2d at 1124.

48. It is not necessary to address the issue of reweighing which is raised in Medlock's brief since we find sufficient evidence to support both aggravating circumstances.

evidence used in mitigation can also be used in aggravation.[49] The trial court specifically advised in his report that he considered Medlock's act of turning himself in to the police as a mitigating circumstance. Because there is no showing of prejudice or harm, this proposition is without merit.

In his eighth proposition of error, Medlock contends that Oklahoma law defining the especially heinous, atrocious or cruel aggravating circumstance is unconstitutionally vague. This Court has considered this argument in other cases and has concluded that the especially heinous, atrocious and cruel aggravating circumstance, as it is currently limited, is constitutionally valid.[50]

Medlock also complains in Proposition IX that the "continuing threat" aggravating circumstance is unconstitutionally vague and creates the risk of arbitrary and capricious imposition of the death sentence. This argument has been made in other cases and has been rejected by the Court.[51]

■■■ In Proposition X, Medlock argues that his death sentence violates the state and federal constitutions because the State relied on the same evidence to support two aggravating circumstances, and the remainder of the evidence was insufficient to support the sentence of death. Medlock complains that the trial court used the same evidence—that is the circumstances of the crime—to support two aggravating circumstances. A similar argument was made in *Smith*. This Court stated, "Where the same act or an indivisible course of conduct is used to establish multiple aggravating circumstances referring to the same aspect of a defendant or his crime,

this Court and others have recognized that only one of the duplicated circumstances should be weighed against whatever mitigating factors the jury may consider."[52] In *Smith*, however, the Court found that use of prior convictions to prove two aggravating circumstances was proper because "although the State did rely upon appellant's prior convictions to support each of the aggravating circumstances alleged, the convictions were not used to show the same aspect of appellant or his crime."[53] Here, the evidence of the circumstances of the crime was used to show different aspects of Medlock and/or his crime. The evidence was used to show (1) that the crime was especially heinous, atrocious and cruel, and (2) that the nature of the crime was so callous as to evidence Medlock's continuing threat to society. It was not error for this evidence to be used in this manner.

■■■ Medlock complains of the introduction of gruesome and repetitious photographs of the deceased's body in Proposition XI. A trial court's decision to allow introduction of certain photographs will not be reversed on appeal unless the trial court abused its discretion in allowing the photographs.[54] While the photographs may have been graphic, the trial court did not abuse its discretion in admitting them.

■■■ In Proposition XII, Medlock contends the trial court committed reversible error by refusing to grant Medlock's motion for a continuance prior to the imposition of the judgment and sentence. During sentencing the trial court advised counsel for the State and the defense that in reviewing the

---

**49.** *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**50.** *See Revilla, supra; Fisher v. State*, 845 P.2d 1272, 1274 (Okl.Cr.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993); *Nguyen v. State*, 844 P.2d 176, 180 (Okl.Cr.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 3006, 125 L.Ed.2d 697 (1993).

**51.** *Malone*, 876 P.2d at 715–716; *Snow*, 879 P.2d at 150; *Revilla, supra; Allen v. State*, 871 P.2d 79, 101 (Okl.Cr.1994); *Ellis*, 867 P.2d at 1302.

**52.** *Id.* at 278.

**53.** *Id. See also Woodruff v. State*, 846 P.2d 1124, 1146 (Okl.Cr.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993); *Berget*, 824 P.2d at 375; *Green*, 713 P.2d at 1040.

**54.** *Castro v. State*, 844 P.2d 159, 171 (Okl.Cr. 1992), *cert. denied,* — U.S. ——, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Hiler v. State*, 796 P.2d 346, 351 (Okl.Cr.1990).

evidence in support of the aggravating circumstances, it examined State's Exhibit 58, which contained the underpants the victim was wearing at the time of her death. The trial court concluded, based on his examination of the evidence, that the panties had been ripped by Medlock. Before sentencing, Medlock requested a continuance to allow a defense expert to examine the exhibit. The trial court denied this request.

Medlock contends that the trial court's examination of Exhibit 58 was an improper *ex parte* examination of the victim's clothing. Although it is true that a judge may not conduct an independent investigation to determine the appropriate sentence, that is not what happened in this case. The trial court examined Kathy's underpants to assist him in determining the credibility of Medlock's assertions that Kathy was dead at the time she sustained injuries to the vagina and rectum. The underpants had been admitted as evidence. Defense counsel did not object to the admission of that evidence. It is appropriate for the trial court to examine the evidence in a case in order to determine sentence. There was no error in doing so. Nor did the trial court abuse its discretion in denying the request for a continuance as State Exhibit 58 was available for testing prior to the hearing and Medlock was not surprised by the admission of the evidence.

### MANDATORY SENTENCE REVIEW

Pursuant to 21 O.S.Supp.1985, § 701.13(C), we must determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) the evidence supports the trial judge's finding of a statutory aggravating circumstance as enumerated in 21 O.S.Supp. 1981, § 701.12. The trial court found the existence of two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel, and (2) there existed the probability that Medlock would commit criminal acts of violence that would constitute a continuing threat to society. We find the evidence supports the existence of both aggravating circumstances. Upon careful consid-

eration of all of the mitigating evidence and the two aggravating circumstances, we find the sentence of death to be substantiated by the record and appropriate. Based on the record, we cannot say the trial court was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp. 1985, § 701.13(C), in finding the aggravating circumstances outweigh the mitigating circumstances and in imposing the sentence of death. Accordingly, we find no error warranting granting the writ of certiorari or modifying the sentence of death.

### DECISION

Medlock's Application for Writ of Certiorari is **DENIED**; the Judgment and Sentence for First Degree Murder is **AFFIRMED.**

LUMPKIN, P.J., JOHNSON, V.P.J., and LANE, J., concur.

STRUBHAR, J., recuse.