Randy Scott PERRY, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–90–1295.

Court of Criminal Appeals of Oklahoma.

April 7, 1995.

Steve Buzin, Chickasha, for defendant at trial.

Nolan Hackler, Asst. Dist. Atty., Waurika, for State at trial.

Cindy G. Brown, Asst. Appellate Indigent Defender, Norman, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Oklahoma City, for appellee on appeal.

## OPINION

CHAPEL, Vice Presiding Judge.

Randy Scott Perry was charged in Grady County District Court, Case No. CRF–90–65, with First Degree Murder with Malice Aforethought, in violation of 21 O.S.Supp. 1989, § 701.7, and Kidnapping, in violation of 21 O.S.1981, § 741. The State filed a Bill of Particulars seeking the death penalty for the

murder charge.[1] The Bill of Particulars alleged two aggravating circumstances in support of the death penalty: (1) the murder was especially heinous, atrocious or cruel; and (2) there existed a probability that Perry would commit criminal acts of violence constituting a continuing threat to society.[2]

A jury trial was held from November 7 through November 9, 1990, before the Honorable James R. Winchester, District Judge. At the conclusion of the State's case-in-chief, the district court dismissed the kidnapping charge, but allowed the trial for murder to continue. At the conclusion of the first stage of trial, the jury returned a verdict of guilty of first degree murder. The case then proceeded to the capital sentencing phase of trial.[3] During sentencing, the jury found the existence of both aggravating circumstances alleged by the State and sentenced Perry to death. Perry has appealed his conviction and sentence. We now affirm Perry's conviction for first degree murder, but modify his sentence to life without parole.

### FACTS

Around 10:00 p.m. on March 27, 1990, Tonya Rodgers, a seventeen-year-old girl, was discovered missing from the parking lot of the Southgate Mini Mall, an abandoned convenience store on State Highway 19 in Chickasha, Oklahoma. As she did almost every night, Rodgers went to the Mini Mall shortly after 9:00 p.m. to call her boyfriend, Ricky Start, from the pay telephone located near the store. Rodgers borrowed her mother's car to drive to the Mini Mall. Rodgers usually parked the car facing the telephone and left the headlights on so she could see while making her call. Start testified that he and Rodgers talked on the telephone from approximately 9:15 p.m. to 9:45 p.m.

When Rodgers did not return home from making her telephone call by 10:00 p.m., her mother and sister went to the Mini Mall to look for her. They discovered Rodgers' car in the parking lot of the store, but Rodgers was missing. The driver's side window of the car was broken, the car keys were in the ignition and the car headlights were off. A compass, which looked similar to the type of compass found on the end of survival knives, and a paper bag were found by the car.

On March 28, Rodgers' body was found in Bitter Creek near the Bitter Creek Bridge in Grady County. The body was naked except for one sock, and her hands were tied behind her back with a shoelace. There was no evidence of sexual abuse. Rodgers' clothes and some buttons from her sweater were found on the river bank, and a pool of blood was found near the creek. There were also two sets of footprints on the river bank. However, the footprints did not match Perry's footprints, and there is no evidence showing whether or not the footprints matched Rodgers' footprints.

The medical examination of Rodgers revealed a stab wound to the chest, a blow to the back of the head, a cut on the arm, a couple of small bruises on her face and a bruise on her knee. These wounds occurred before death. There were also some postmortem wounds. The medical examiner determined Rodgers died from the stab wound to the chest.

In March 1990, Perry was living with his mother, his stepfather, Mark Hill, and his half-brother, Kevin Patterson. Perry was on medical leave from the military. It does not appear that Perry knew or had any connection with Rodgers.

On March 27, Perry got out of bed around 5:00 p.m. During the early evening hours, Perry finished the one-liter bottle of tequila that he had started drinking the previous day and ate dinner. Apparently, Perry drank approximately a half-a-liter of tequila on a daily basis. At some point that evening,

---

**1.** The crime of kidnapping is punishable by a term of imprisonment not exceeding ten years. 21 O.S.1981, § 741.

**2.** 21 O.S.Supp.1989, § 701.7 et seq.

**3.** Under Oklahoma law, capital trials are conducted in two stages. First, the jury determines the issue of guilt or innocence. If a jury finds a defendant guilty of first degree murder, the trial proceeds to sentencing where the jury determines whether a sentence of life, life without the possibility of parole, or death is the appropriate punishment. 21 O.S.Supp.1989, § 701.10.

Perry's mother, Beverly Hill, asked Perry if he would pick Patterson up from work. Patterson worked at the local Dairy Queen. Perry agreed to help his mother and left the house around 9:30 p.m. to pick up his step-brother.

Patterson testified he was working at the Dairy Queen on the evening of March 27. He stated he finished work at approximately 10:15 and left work with Perry around 10:30 p.m. Patterson stated he could not pinpoint the time at which Perry arrived at the Dairy Queen.

Patterson testified that Perry was driving their mother's brown Nova that evening. According to Patterson, Perry drove to a gas station to buy some gas. Then Perry drove to the Southgate Mini Mall to look for his hat, but they did not stop to look for the hat there. Perry next drove "[o]ut to a bridge someplace" to look for his hat.[4] Apparently Perry found his hat somewhere near the bridge.

The prosecutor then asked Patterson if Perry made any statements during the car ride. After appearing to avoid answering the question and saying that "[i]t's all kind of jumbled up right now", Patterson testified that Perry said "he had killed her."[5] According to Patterson, when the report came over the police scanner that Rodgers was missing, Perry indicated she was the girl he had killed. Patterson then indicated he was not sure what else Perry said. The prosecutor asked Patterson if he had testified at the preliminary hearing that Perry said he stabbed the girl, and Patterson agreed that he had so testified.[6]

In addition to Patterson's testimony, another witness, Randy Allen, testified that he saw Perry's car by the Bitter Creek Bridge around 10:10 p.m. on March 27. Perry's mother testified Perry's clothes were wet and sandy the night of March 27. Hair matching Rodgers' hair was found in Perry's car.

However, Perry's step-father testified that he had given Rodgers a ride in his car shortly before March 27 and she had brushed her hair in the car at that time.

Based on this evidence, the jury concluded that Perry was guilty of the murder of Tonya Rodgers. During sentencing, the State incorporated all of the first stage evidence. The State then called one witness who testified that Rodgers was wearing a watch at the time of her death. The watch had stopped running and the time on the watch was 10:10. In mitigation, Perry's mother testified about his childhood, his mental health history and his relationship with his children. Based on this evidence, the jury found the existence of two aggravating circumstance and recommended Perry be sentenced to death.

## COMPETENCY ISSUES

In Proposition VIII of his brief, Perry contends that the verdict finding him competent to stand trial was in error. We find no merit in Perry's arguments that the competency determination was improper or in error.

Prior to trial, Perry filed an application to determine competency. Initially he was evaluated by Dr. John Quinn, who expressed some question about whether Perry comprehended the severity of the crimes with which he was charged and the possible punishments that might be imposed for such crimes. Based on Dr. Quinn's observations and report, Perry was referred to Eastern State Hospital for further evaluation.

At Eastern State Hospital, Dr. Charles Patterson examined Perry and concluded Perry was competent to stand trial. Subsequently, Dr. Quinn reevaluated Perry and determined him competent to stand trial. A post-evaluation competency hearing was held and the trial court concluded that Perry was competent to stand trial.[7]

---

4. (Vol. III Tr. at 460).

5. (Vol. III Tr. at 460).

6. Patterson, whose testimony against Perry was critical to the State's case, suffered from a serious drug and alcohol problem. He admitted he had inhaled aerosol can fumes on March 27—the

day Perry confessed to him. He also stated he used drugs and/or alcohol both before the preliminary hearing and before trial.

7. At Perry's request, the post-examination competency hearing was conducted before a judge rather than a jury. See 22 O.S.1981, § 1175.4(B).

■ In sub-proposition A of Proposition VIII, Perry complains that the trial court erred in taking judicial notice of Dr. Patterson's letter reporting his findings about Perry's competence to stand trial. After Perry was evaluated at Eastern State Hospital, the court received a letter from Dr. Patterson in which the doctor reported that Perry was competent to stand trial. Patterson did not testify at Perry's competency hearing, nor did anyone else possessing knowledge of Dr. Patterson's letter testify with respect to that report. Nonetheless, at the conclusion of the post-examination competency hearing, the trial court, over the objections of defense counsel, stated that it would take judicial notice of Dr. Patterson's letter.

■ On appeal, Perry complains that Dr. Patterson's report constituted inadmissible hearsay. Under the business records exception to the hearsay rule, Dr. Patterson's letter would be admissible if the foundational requirements of 12 O.S.1981, § 2803(6) were met.[8] To comport with the foundational requirements of § 2803(6), it was not necessary for Dr. Patterson to testify.[9] However, it was necessary that "someone who could testify that the report was in fact made at or near the time and by, or from information transmitted by, a person with knowledge of the circumstances reported"[10] testify and authenticate the document. Here, neither Dr. Patterson nor anyone else possessing knowledge of the Patterson letter testified. Accordingly, admission and consideration of such letter was error.[11] However, this error

does not warrant relief because a review of the evidence and the competency hearing reveals this error is harmless.[12]

Perry bore the burden of proving, by clear and convincing evidence, that he was incompetent to stand trial.[13] In support of his claim of incompetency, Perry called Dr. Quinn. Dr. Quinn testified that, while he initially had some questions about Perry's ability to assist counsel, upon further and more probing examination, he concluded that Perry could rationally assist counsel. No other evidence was offered to show Perry was incompetent. The Patterson report was cumulative of Quinn's testimony and did not contradict any of the evidence presented at the hearing.[14] Under these circumstances, it is clear beyond any reasonable doubt that even if the trial court had not taken judicial notice of Patterson's report, it nonetheless would have found Perry competent to stand trial. Accordingly, no relief is warranted.

■ In sub-proposition B of Proposition VIII, Perry challenges the constitutionality of the standards that Oklahoma uses to determine a defendant's competence to stand trial. Under Oklahoma law, competency is defined as follows:

> "Competent" or "competency" means the present ability of the person arrested for or charged with a crime to understand the nature of the charges and proceedings brought against him, and is able to effectively and rationally assist in his defense.[15]

---

8. 12 O.S.1981, § 2803(6); *Walker v. State,* 826 P.2d 1002 (Okl.Cr.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992); *Jones v. State,* 660 P.2d 634 (Okl.Cr.1983). Section § 2803(6) provides:

   Any form of memorandum, report, record or data compilation of acts, events, conditions, opinions or diagnosis, made at or near the time by or from information transmitted by a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession,

   occupation and calling of every kind, whether or not conducted for profit.

9. *Jones,* 660 P.2d at 642.

10. *Id.* at 643. *See Walker,* 826 P.2d at 1006.

11. *Jones,* 660 P.2d at 643.

12. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

13. *Castro v. State,* 871 P.2d 433 (Okl.Cr.1994); *Siah v. State,* 837 P.2d 485 (Okl.Cr.1992).

14. *See Jones,* 660 P.2d at 643; *Lewis v. State,* 586 P.2d 81 (Okl.Cr.1978).

15. 22 O.S.1981, § 1175.1.

Under this definition of competency, Oklahoma employs a two prong test to determine whether a defendant is competent to stand trial: "First, the accused must have sufficient ability to consult with his attorney. Second, the accused must have a rational and actual understanding of the proceedings against him."[16] Perry contends that Oklahoma's definition of competency and, in particular, the use of the term "nature" in the definition, are not sufficient to ensure an adequate and proper determination that the defendant possesses a rational as well as factual understanding of the proceedings and that he is able to rationally assist counsel. We disagree.

In *Lambert v. State*,[17] the Court faced a similar argument. In *Lambert*, the defendant claimed that section 1175.1, and the use of the term "nature" in the definition provided under that statute, failed to adequately require a determination that the defendant possess a rational as well as factual understanding of the proceedings. The Court rejected this argument and found the Oklahoma competency standard comported with the United States Supreme Court standard [18] as set forth in *Dusky v. United States*.[19] We concluded that the term "nature" was adequate and clear enough to embrace the requirement that a defendant possess a rational understanding of the proceedings as well as factual understanding of those proceedings.[20]

Similarly, in this case, we find that the competency proceedings in Perry's case com-

ported with due process and the requirements of *Dusky*.[21] Further, the evidence in this case fully supports a finding that Perry possessed a rational understanding of the proceedings, was able to rationally assist counsel and was competent to stand trial. This proposition is without merit.

## ISSUES RELATING TO THE TRIAL COURT'S COMMUNICATION WITH THE JURY

■ In his first proposition of error, Perry argues his conviction and sentence must be overturned based on the trial judge's communication with the jury that occurred after the conclusion of the first stage of trial but before the second stage of trial began. Neither Perry, his counsel nor counsel for the State were present during the judge's discussion with the jury. Perry contends that such communication with the jury violated his right to a fair and impartial jury as guaranteed by the Sixth Amendment of the United States Constitution and Article II, section 20 of the Oklahoma Constitution. We disagree.

■ A defendant has a due process right to be present during trial proceedings " 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." [22] "[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his ab-

---

**16.** *Middaugh v. State,* 767 P.2d 432, 434 (Okl.Cr. 1988).

**17.** 888 P.2d 494, 498 (Okl.Cr.1994).

**18.** *Id.*

**19.** 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). *Dusky* provides that, in determining competency:

... it is not enough for the district judge to find that 'the defendant [is] oriented to times and place and [has] some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'

*Id.* at 402, 80 S.Ct. at 789.

**20.** *Lambert, supra.*

**21.** Perry's reliance on *Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992), is misplaced. In *Lafferty,* the Tenth Circuit concluded that a Nevada trial court's determination that a defendant was competent to stand trial was fundamentally flawed because the trial court failed to determine that the defendant had a rational understanding of the proceedings. As we made clear in *Lambert,* the Oklahoma competency standard fully embraces the rationality component of competency as expressed in *Dusky*. *Lafferty* is not applicable to the facts of this case.

**22.** *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985).

sence, and to that extent only.' " [23] The defendant's presence is not required where such "presence would be useless, or the benefit but a shadow." [24]

A defendant also has a state statutory right to be present during certain communications with jurors. [25] For instance, a trial court should not conduct communications with the jury outside the presence of counsel and the defendant during deliberations; [26] nor should anyone communicate with the jury regarding the merits of the case prior to submission of the case to the jury. [27] However, this Court has also made clear that not every communication between the court and jury outside the presence of counsel is prohibited. [28] For example, communications with the jury regarding simple housekeeping matters do not give rise to a violation of the statutory right to be present. [29] "Rather, prejudice arises when the trial court communicates with the jury outside the parameters of [the statute.]" [30]

Here, after the jury rendered its guilty verdict, but before the beginning of the sentencing stage of the trial, the trial court called a recess during which he met with counsel in chambers. After the recess and the conference with counsel for both parties, the following occurred in the jury room outside the presence of counsel and the defendant:

> THE COURT: Let's show that I'm in the jury room with the bailiff and myself and you. I've talked with both counsel and we have decided to take about an hour delay and continue sentencing. I take it you all want to go ahead and finish up, if you can? (Jury signifies.)
>
> THE COURT: We don't want anybody to rush, but what I've decided is since you still have your luggage out at the motel, is to let you go with Joyce, go out and pack your stuff up, load it in your car, and come back about 4:30. The courthouse closes at 4:30, so you should be able to park fairly close. Leave your luggage, and as a group come back upstairs and we'll begin the second stage. I want you to understand, if it does run late or somewhere in the deliberation you say, "I think we need to go back to the motel and sleep on this or rest," we'll do that, too. I don't want you to feel like we are trying to keep you from taking the time you need, but I'd like to do that at this time. Does anybody have a problem with this?
>
> THE JUROR: The girls were talking about an individual that was out there.
>
> THE COURT: Joyce has advised me and we are trying to catch him to see if he— you shouldn't have any problem.
>
> JUROR: It's scary.
>
> JUROR: If he shows up at the motel, just tell her?
>
> JUROR: He was not there all day.
>
> THE COURT: I know who you're talking about.
>
> JUROR: He was walking around this morning at the motel.
>
> THE COURT: He's not said anything to any of you?

23. *Id.* at 526, 105 S.Ct. at 1484, *quoting, Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 332, 333, 78 L.Ed. 674 (1934).

24. *Snyder v. Massachusetts,* 291 U.S. 97, 106–107, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).

25. 22 O.S.1981, §§ 853, 857, 894.

26. In *Badgwell v. State,* 418 P.2d 114 (Okl.Cr. 1966), the court and jury, during deliberations, exchanged notes regarding the indeterminate sentencing law. Counsel did not know about the exchange of notes until after the jury had rendered its verdict. Relying on 22 O.S. §§ 894 and 853, this Court found it was error for the trial court to communicate with the jury outside the presence of the defendant and his counsel.

27. 22 O.S.1981, § 853.

28. *Walker v. State,* 887 P.2d 301, 312, n. 50 (Okl.Cr.1994); *Wilson v. State,* 534 P.2d 1325 (Okl.Cr.1975).

29. *Wilson, supra.*

30. *Walker,* 887 P.2d at 312, n. 50. *Walker* involved a technical violation of § 894 that occurred during deliberations when the trial court failed to call the jury into open court and, instead, communicated with the jury by note. However, since the trial court discussed the note with counsel and the contents of the note were proper, sending the note to the jury did not violate the intent and purpose of § 894.

JUROR: No.

THE COURT: You are not to form or express an opinion about the second stage of the proceedings until the evidence is presented to you and you deliberate. Don't discuss it with anyone or watch anything. So we'll let you go and get packed up and we'll see you back at 4:30.

(Vol. III Tr. at 545–547)

In objecting to this discussion, Perry points to two aspects of the conversation which he claims prejudiced his right to due process: (1) the trial court's brief discussion with the jurors about the man at the motel; and (2) the trial court's instructions that the jurors could check out of the motel prior to the commencement of sentencing. Contrary to Perry's claims, we find the trial court's discussion with the jury was not improper as it primarily concerned the logistics of returning the jury to the court for second stage proceedings and did not thwart Perry's ability to defend himself or affect his right to a fair hearing.

With respect to the conversation regarding the man at the motel, this discussion was very short and did not concern the merits of the case. The trial court simply advised the jurors that the court was taking care of the problem. Moreover, the trial court determined that none of the jurors had spoken to the man, and there has been no showing that any of the jurors were influenced or biased due to the presence of the man. This brief conversation did not have a reasonably substantial relation to Perry's ability to defend against the charges.

■ Perry further asserts that when the trial court told the jurors they could check out of the motel he placed coercive pressure on the jurors to impose a sentence quickly. We do not see such coercive pressure being exerted by the trial court. Although the trial court advised the jurors to check out of the

motel, he made very explicit and clear that he did not want to rush the jurors and that they could return to the motel if needed. Because of the innocuous and routine nature of the comments, the benefit of having the defendant or counsel present would be "but a shadow," and was not necessary.[31] Accordingly, relief is not warranted under this proposition of error.

## ISSUES RELATING TO GUILT AND INNOCENCE

■ In Proposition II, Perry contends the trial court erred in allowing Kevin Patterson, Perry's step-brother, to invoke his Fifth Amendment right to silence during cross-examination. This proposition is without merit.

After extensively questioning Patterson about his drinking and drug use, defense counsel asked Patterson:

Q. What was the other source [of your money to buy drugs]?

A. I'm going to need the Fifth on that.

Q. Were you selling drugs, Kevin?

A. No, sir.

Q. Where were you getting your drugs from? [32]

At that point, the prosecutor objected on the grounds of relevancy. The trial court sustained the objection because Patterson had exercised his Fifth Amendment rights. Defense counsel continued to question Patterson, but did not inquire any further into the source of the drugs. Further, defense counsel did not make an offer of proof to show how this particular line of questioning—about the source of the drugs—was relevant to the case.

Although trial courts possess wide latitude in limiting cross-examination,[33] in certain cases, it may be error to curtail a defendant's

---

31. *Snyder*, 291 U.S. at 106–107, 54 S.Ct. at 332.

32. (Vol. III Tr. at 486).

33. *Hall v. State*, 698 P.2d 33, 36 (Okl.Cr.1985) ("The extent of cross-examination rests in the sound discretion of the trial court and this Court will reverse only if that discretion is clearly abused, resulting in manifest prejudice to the

accused"); *Hickerson v. State*, 565 P.2d 684, 686 (Okl.Cr.1977) ("We have consistently held that the extent of cross-examination rests in the sound discretion of the trial court and it is only in cases of clear abuse of such discretion, resulting in a manifest prejudice to the accused that this Court will reverse a case").

cross-examination of a witness.[34] In *Delaware v. Van Arsdall*,[35] the Supreme Court stated:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." *Davis v. Alaska, supra,* 415 U.S., at 318, 94 S.Ct., at 1111. Respondent has met that burden here: A reasonable jury might have received a significantly different impression of Fleetwood's credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination.

In Perry's case, however, the trial court did not err in limiting counsel's questioning. In those cases in which courts have found that limiting certain cross-examination was error, the defendant has made some type of showing as to what the prohibited line of questioning would have revealed and how it would have affected his defense.[36] Here, Perry has failed to show how the question regarding the source of Patterson's drugs would have had any connection to Patterson's motive, bias or credibility. There is no suggestion anywhere that Patterson was testifying against Perry because of some agreement with the district attorney or because of some drug-related incident. Nothing in the record indicates that this line of questioning would have revealed anything about Patterson's motivation to testify. Nor did trial counsel submit an offer of proof to demonstrate the need for this line of questioning. Under these circumstances, the trial court

did not abuse its discretion by limiting the cross-examination of Patterson.[37] Relief is not warranted under this proposition of error.

Under Proposition IV, Perry argues the evidence was insufficient to prove beyond a reasonable doubt that he was guilty of first degree malice aforethought murder. The standard for reviewing the sufficiency of the evidence in this case is whether the evidence, when viewed in the light most favorable to the State, allows a rational juror to find the elements of the crime beyond a reasonable doubt.[38] The State's evidence against Perry was (1) Patterson's testimony that Perry confessed to the murder; (2) Patterson's testimony that, shortly after the murder, Perry went to the Mini Mall and a bridge looking for a hat; (3) evidence that Perry found his hat near a bridge; (4) Allen's testimony that he saw Perry's car at the Bitter Creek Bridge around 10:10 p.m.; (5) Perry's mother's testimony that Perry's clothes were wet and sandy on the night of March 27; and (6) the identification of Rodgers' hair in Perry's car. We find the evidence, as a whole, was sufficient to sustain Perry's conviction.

Under sub-proposition A of this proposition of error, Perry argues, without citation to authority, that evidence that Perry may have been at the Bitter Creek Bridge the night of the murder does not prove that Perry killed Rodgers. Of course, it is true that the evidence of Perry's presence at the bridge alone does not prove that he killed Rodgers. However, this evidence tends to corroborate Patterson's testimony and, in light of all the other evidence presented, this evidence supports the jury's verdict.

---

**34.** *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1435–1436, 89 L.Ed.2d 674 (1986).

**35.** *Id.* at 680, 106 S.Ct. at 1436.

**36.** *See e.g. Davis v. Alaska,* 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1109–1110, 39 L.Ed.2d 347 (1974) (prohibited line of cross-examination—regarding witness' juvenile convictions and probation status—was relevant to show witness may have implicated defendant to throw suspicion off

himself); *Wing v. State,* 727 P.2d 1383, 1385 (Okl.Cr.1986) (error in not allowing defendant to question his ex-wife—the State's key witness—about their child custody dispute to show ex-wife's motivation in alleging defendant molested their children).

**37.** *Beck v. State,* 824 P.2d 385 (Okl.Cr.1991); *Withers v. State,* 507 P.2d 552 (Okl.Cr.1973).

**38.** *Spuehler v. State,* 709 P.2d 202, 203–04 (Okl.Cr.1985).

■ Under sub-proposition B, Perry contends the hair evidence offered at trial was improper, lacked probative value and should be excluded in all cases. Because Perry failed to object to the admission of the hair evidence, we will review for plain error only.[39] In reviewing the evidence and the law, it is evident that there was no plain error. Although there was evidence that Rodgers had been in the Perry car prior to March 27 and had brushed her hair at that time, this evidence did not preclude admission of the hair found in Perry's car. The question of when the hair appeared in the car was properly a question for the jury.[40] The argument that forensic hair evidence is unreliable and should not be allowed in any case has been rejected by this Court.[41] Accordingly, the admission of the hair evidence was proper and did not undermine the jury's finding of guilt.

■ Under sub-proposition C, Perry contends Patterson's testimony should not have been admitted because it was highly unreliable due to Patterson's mental instability and heavy drug and alcohol use. At the outset, it again must be noted that trial counsel did not object to Patterson's testimony on the grounds that he was incompetent to testify. Perry has thus waived all but plain error on this issue. Neither the law or evidence support a finding of plain error.

■ Under section 2601 of the Code of Evidence, every person is a competent witness unless otherwise provided by the Code. Drug and alcohol addiction does not render one incompetent to be a witness. Rather, the issue of drug and alcohol addiction goes to the question of credibility, which is properly a question for the jury.[42]

Further, "[a] reviewing court must accept all reasons, inferences and credibility choices that tend to support the verdict."[43] Although Patterson's testimony was at times equivocal and he had a long and extensive history of drug and alcohol abuse, it was proper for the jury to hear this evidence and determine if they believed Patterson or not.[44] Perry does not suggest that the jury was not made fully aware of Patterson's substance abuse and mental health problems and, in fact, the jury was fully apprised of Patterson's difficulties and limitations. It is apparent, however, that in spite of the evidence of substance abuse and mental health problems, the jury believed Patterson was telling the truth. Patterson's testimony together with the other evidence presented, when taken in the light most favorable to the State, supports the jury's verdict.

■ In his seventh proposition of error, Perry contends the trial court erred in failing to instruct the jury on voluntary intoxication and first degree diminished capacity manslaughter based on voluntary intoxication. For the reasons stated below, this proposition is without merit.

First, there was no request for any instructions on voluntary intoxication or manslaughter. Thus, Perry has waived all but plain error. Second, while there was evidence that Perry drank anywhere from half-a-liter to a liter of tequila, his defense at trial was not that he killed Rodgers while intoxicated, but rather that he did not kill Rodgers at all.[45] Since Perry's defense was he did not kill Rodgers—as opposed to arguing that he killed her while intoxicated—the trial court did not commit plain error by failing to sua

**39.** *See generally Wolfe v. State,* 736 P.2d 546 (Okl.Cr.1987).

**40.** *See cf. Allen v. State,* 862 P.2d 487, 493 (Okl. Cr.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1657, 128 L.Ed.2d 375 (1994).

**41.** *See Moore v. State,* 788 P.2d 387, 398 (Okl. Cr.), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990) ("admission of expert testimony on microscopic comparison of hair and/or fiber samples has been implicitly, if not explicitly, approved").

**42.** *See Romano v. State,* 847 P.2d 368, 379 (Okl. Cr.1993), *aff'd,* — U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

**43.** *Id.* at 380.

**44.** *Id.* at 379–380.

**45.** *Hooker v. State,* 887 P.2d 1351, 1361 (Okl.Cr. 1994).

sponte give a voluntary intoxication instruction.[46]

## INEFFECTIVE ASSISTANCE
## OF COUNSEL

In his third proposition of error, Perry contends his conviction and sentence must be overturned because he was denied effective assistance of counsel. In making this argument, Perry points to trial counsel's alleged failure to request discoverable information and to adequately investigate and present evidence. We find that Perry has failed to make a showing that he was deprived of his right to effective assistance of counsel.

In *Strickland v. Washington,*[47] the Supreme Court laid out the well-known test for ineffective assistance of counsel claims:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[48]

Here, there is nothing in the trial transcripts or the record indicating that counsel was not well-prepared for trial. To the contrary, counsel thoroughly cross-examined the State's witnesses and, in particular, aggressively cross-examined Patterson revealing his extensive history of drug and alcohol abuse as well as mental instability. Counsel also called Perry's mother to testify during sentencing about Perry's horrible childhood. Although there are no motions for discovery in the record, Perry has failed to show that trial counsel did not receive the district attorney's complete file, nor has he pointed to any evidence or documents of which trial counsel was not aware.

Perry claims that trial counsel failed to investigate accounts of other vehicles at the Mini Mall near or around the time of Rodgers' disappearance. However, there is no indication that counsel did not investigate such leads and there has been no showing that these leads would have affected the outcome of the case. Perry has not shown that counsel's performance was deficient, nor has he shown that he was prejudiced by such allegedly deficient performance. Clearly, under these circumstances, Perry's claim that

---

**46.** *See Smith v. State,* 727 P.2d 1366, 1371 (Okl. Cr.1986), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780, *reh. denied,* 483 U.S. 1044, 108 S.Ct. 17, 97 L.Ed.2d 806 (1987).

Perry also relies on *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) to argue that failure to provide these instructions deprived the jury of the ability to impose a non-capital third option supported by the law and evidence. Perry's reliance on these cases is misplaced. In *Beck,* the Court reversed the defendant's conviction and death sentence because Alabama law forbids the trial court from providing the jury with a lesser-included offense instruction even though the evidence warranted the instruction. Further, the Alabama death penalty statute required the jury to sentence the defendant to death upon finding the defendant guilty of the capital offense. If the jury found that the defendant committed a violent crime but did not want to impose the death sentence the only option was to set the defendant free. However, as the Court made clear in *Schad v. Arizona, Beck* does not compel the trial

court to provide lesser-included offense instructions where such instructions are not supported by the evidence. In *Schad,* the Court stated its primary concern in *Beck* was the all-or-nothing effect of the state rule that the jury could only find the defendant guilty of capital murder where the death sentence would be imposed or the jury had to find the defendant innocent. In Perry's case, however, the jury had the option of imposing life, life-without-parole or death. The all-or-nothing concerns raised in *Beck* are not at issue here.

**47.** 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

**48.** *See also Wilhoit v. State,* 816 P.2d 545, 546 (Okl.Cr.1991) (in making ineffective assistance of counsel claim, defendant "must be able to establish 1) that counsel's assistance was not reasonably effective, and 2) that his deficient performance denied the defendant a fair trial and that but for counsel's deficient performance, the result of the trial could possibly have been different").

he was deprived his right to effective assistance of counsel lacks merit.

### SECOND STAGE ISSUES

Perry raises four issues related exclusively to the second stage of his trial.[49] Under Oklahoma law, the death penalty may be imposed only under certain, limited aggravating circumstances.[50] Unless a murder, or the person who committed the murder, falls within one or more of the carefully circumscribed statutory aggravating circumstances, the death penalty may not be considered among the possible sentencing options.

▆ In Perry's case, the State alleged, and the jury found, two aggravating circumstances: (1) the murder was especially heinous, atrocious or cruel;[51] and (2) there existed a probability that Perry would commit criminal acts of violence constituting a continuing threat to society.[52] In Propositions V and VI, Perry argues the evidence presented at his trial is insufficient to support either aggravating circumstance.

▆ At trial, the State bears the burden of proving beyond a reasonable doubt the aggravating circumstances it has charged.[53] On appeal, the standard for reviewing whether the State has met its burden of proof at trial is "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed."[54] As detailed below, after a long and careful review of the record in this case, we are left with no choice but to agree with Perry's contentions that the evidence simply does not support a finding that the murder was especially heinous, atrocious or cruel, or that there exists a probability that Perry would commit acts of violence constituting a continuing threat to society. Because the evidence will not support the two charged aggravating circumstances, we find that Perry's sentence of death must be vacated and modified to life without the possibility of parole.

▆ To support a finding that a defendant committed a murder in an especially heinous, atrocious or cruel manner, the State must show the murder was preceded by tor-

**49.** Perry contends that the evidence was insufficient to support either aggravating circumstance and he contends that the aggravating circumstances of heinous, atrocious or cruel and the continuing threat are unconstitutional. Because we agree with Perry that the evidence is insufficient to support either aggravating circumstance, we need not reach the constitutional attacks on these aggravating circumstances, which Perry raises in Propositions IX and X. However, this Court has repeatedly rejected such constitutional attacks on these two aggravating circumstances and we again find no merit in such arguments. *See e.g. Hooker v. State, supra; McGregor v. State,* 885 P.2d 1366 (Okl.Cr.1994); *Mitchell v. State,* 884 P.2d 1186 (Okl.Cr.1994); *Walker v. State,* 887 P.2d 301 (Okl.Cr.1994); *Medlock v. State,* 887 P.2d 1333, 1350 (Okl.Cr.1994).

**50.** At the time of Perry's offense, the Oklahoma Legislature provided the following aggravating circumstances, *i.e.* those special circumstances under which the jury could consider imposition of the death penalty:

1. The defendant was previously convicted of a felony involving the use or threat of violence to the person;
2. The defendant knowingly created a great risk of death to more than one person;
3. The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration;

4. The murder was especially heinous, atrocious, or cruel;
5. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;
6. The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony;
7. The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; or
8. The victim of the murder was a peace officer as defined by Section 99 of Title 21 of the Oklahoma Statutes, or guard of an institution under the control of the Department of Corrections, and such person was killed while in performance of official duty.

21 O.S.Supp.1989, § 701.12.

**51.** 21 O.S.Supp.1989, § 701.12(4).

**52.** 21 O.S.Supp.1989, § 701.12(7).

**53.** *Booker v. State,* 851 P.2d 544, 548 (Okl.Cr. 1993).

**54.** *Bryson v. State,* 876 P.2d 240, 259 (Okl.Cr. 1994); *see Romano v. State,* 847 P.2d at 387; *Brogie v. State,* 695 P.2d 538, 542 (Okl.Cr.1985), *modified on other grounds,* 760 P.2d 1316 (Okl. Cr.1988).

ture or physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty.[55] "Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met."[56] It is, therefore, critical that the State prove that the victim consciously suffered before death.[57] Prosecutors have satisfied this requirement by relying on evidence that the victim suffered numerous defensive wounds indicating that the victim was conscious and attempted to fight off her attacker;[58] statements from the defendant indicating the victim consciously suffered serious physical abuse or extreme mental cruelty prior to death;[59] witness testimony that victim was alive and conscious at the time the physical abuse was inflicted;[60] or medical evidence that the victim was conscious during the infliction of serious physical injury.[61] In contrast, the heinous, atrocious or cruel aggravating circumstance cannot be sustained where the evidence will not support a finding of conscious physical suffering or extreme mental suffering. For instance, this Court has found the evidence insufficient to support this aggravating circumstance where there was evidence that death was instantaneous,[62] where the evidence failed to establish which gunshot wound was fatal,[63] or where the evidence readily supported the conclusion that the victim was rendered unconscious prior to the infliction of serious physical injury or mental torture.[64]

Here the State's theory was that, after Rodgers finished her telephone call with Start, Perry approached her in the parking lot of the Mini Mall, took Rodgers in his car to the Bitter Creek Bridge, killed her by the creek and dumped her body at the creek. Under the State's theory at most an interval of twenty-five minutes elapsed from the time of Perry's initial contact with Rodgers until her death. However, the State did not put on any evidence to show that Rodgers was conscious other than for, perhaps, the initial contact between Rodgers and Perry.

According to the medical examiner, Dr. Larry Balding, there were some small bruises on Rodgers' face, a cut on the arm, a blow to the head, which could have rendered Rodgers unconscious, and a stab wound to the chest, which killed Rodgers. Balding could not determine in what order Rodgers received these wounds nor could he determine when Rodgers was rendered unconscious. Based on Balding's testimony, it is reasonable to conclude that Rodgers was struck on the head and rendered unconscious before she received any of the other physical injuries. The State failed to produce any other evidence to show that Rodgers was conscious when she received the other injuries. For example, there was no evidence that any of the wounds Rodgers suffered were defensive. There was no evidence of a struggle in Perry's car or at the river bank. The State failed to show that the footprints found near the creek belonged to either

---

**55.** *Medlock, supra; Mitchell, supra; Hooks v. State,* 862 P.2d 1273, 1282–1283 (Okl.Cr.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Romano,* 847 P.2d at 387; *Hayes v. State,* 845 P.2d 890, 892 (Okl.Cr.1992); *Berget v. State,* 824 P.2d 364, 373 (Okl.Cr.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992); *Battenfield v. State,* 816 P.2d 555, 565 (Okl.Cr.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

**56.** *Battenfield,* 816 P.2d at 565. *See Stafford v. State,* 832 P.2d 20, 23 (Okl.Cr.1992).

**57.** *See e.g. Hayes, supra; Crawford v. State,* 840 P.2d 627 (Okl.Cr.1992); *Battenfield, supra.*

**58.** *Walker, supra; Romano, supra; Woodruff v. State,* 846 P.2d 1124 (Okl.Cr.), *cert. denied,* —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

**59.** *Neill v. State,* 65 OBJ 3369, —— P.2d —— (Okl.Cr. Oct. 13, 1994).

**60.** *McCracken v. State,* 887 P.2d 323, 332 (Okl. Cr.1994).

**61.** *Bryson,* 876 P.2d at 260.

**62.** *Booker, supra.*

**63.** *Brown v. State,* 753 P.2d 908, 913 (Okl.Cr. 1988).

**64.** *Hayes,* 845 P.2d at 892 (requisite torture or physical abuse not shown where victim sustained no defensive wounds and evidence supported conclusion that victim was rendered unconscious prior to receiving most of her injuries); *Battenfield, supra.*

Rodgers or Perry.[65] Perry's own statement to Patterson that he killed the girl did not reveal where or when Rodgers was killed, in what order the injuries were inflicted, or whether Rodgers experienced conscious physical or mental suffering prior to death.

On appeal, the State admits the evidence showing Rodgers suffered serious physical abuse "is not so great," [66] but contends the evidence supported a finding of mental torture.[67] The State argues that the victim suffered mental torture during her kidnapping and abduction. However, the claims of mental torture suffer from the same infirmities as the claims of physical torture: there is absolutely no evidence to show that Rodgers was conscious after her initial contact with Perry in the parking lot of the Mini Mall. Based on the medical examiner's testimony, it is reasonable to conclude that Rodgers was rendered unconscious in the parking lot of the Mini Mall, and the State, again, failed to offer any evidence to show otherwise. For instance, there was no evidence showing where Rodgers received the blow to the head. The only evidence of a struggle was the broken driver's window in Rodgers' car in the Mini Mall parking lot, which is consistent with a conclusion that Rodgers was rendered unconscious at the Mini Mall. The State did not tie the footprints at the riverbank to either Perry or Rodgers, and the hair found in Perry's car is not sufficient to show mental torture, since there is absolutely nothing to show that Rodgers was conscious when the hair was pulled from her head. Finally, at the conclusion of the first stage of trial, the trial court dismissed the kidnapping count, indicating a lack of evi-

dence supporting a finding that Rodgers was unlawfully abducted.

Perry's case is remarkably similar to *Crawford v. State,*[68] in which this Court found the evidence insufficient to support a finding that the murder was committed in an especially heinous, atrocious or cruel manner. In *Crawford,* the medical examiner concluded that the cause of death was a blunt blow to the head and manual strangulation of the victim. However, the medical examiner could not determine which injury—the strangulation or the blow to the head—occurred first. Further, there was no evidence presented as to the level of suffering or as to the time at which the decedent lost consciousness.[69] The Court noted that although there was evidence that the victim had struggled on the bed with her assailant, there was no evidence to show that the decedent did not die instantly as a result of that struggle. The Court stated, "[a] record so bereft of evidence leads only to speculation and not to the rational drawing of reasonable inferences." [70]

Similarly, the record in this case cannot support a finding that Rodgers experienced conscious physical suffering or mental torture before death without causing this Court to engage in pure speculation and guesswork. The State bears the burden of proving this aggravating circumstance beyond a reasonable doubt. This Court is not empowered to infer or supply critical, necessary facts that the prosecutor failed to offer at trial.[71] We must confine ourselves to the trial record, and when such record is so woefully lacking, as it is in this case, we have no choice but to conclude that the evidence is insufficient to

65. Such evidence could have demonstrated that Rodgers was conscious for some period of time after leaving the parking lot, but such evidence, if it existed, was never offered.

66. (Appellee's Br. at 33).

67. *Berget v. State,* 824 P.2d 364, 373 (Okl.Cr. 1991) ("Torture in the context of the [heinous, atrocious or cruel] aggravating circumstances may take any of several forms. Torture may include the infliction of either great physical anguish or extreme mental cruelty").

68. 840 P.2d 627 (Okl.Cr.1992).

69. *Id.* at 641.

70. *Id.*

71. *See Booker,* 851 P.2d at 548 (evidence insufficient to prove torture or serious physical abuse where evidence showed victim died instantaneously from single gunshot wound); *Battenfield,* 816 P.2d at 565 (evidence insufficient to show torture or physical abuse where victim, who died from multiple blunt force injuries to head and chest, was rendered unconscious due to blows to head).

support the heinous, atrocious or cruel aggravating circumstance.

■ The second aggravating circumstance in this case is that Perry posed a continuing threat to society. Again, the State wholly failed to prove its case.

■ When the State alleges the continuing threat aggravating circumstance, it is required to present proof that the defendant's behavior presents a threat to society and that threat will continue in the future.[72] "The aggravator is not established unless the evidence at trial supports a finding that the defendant will continue to present a threat to society after sentencing."[73] To make this finding it is "necessary that the State present sufficient evidence concerning prior convictions or unadjudicated crimes to show a pattern of criminal conduct that will likely continue in the future to support its 'continuing threat' contention."[74]

Here, the only evidence that the State presented to prove the continuing threat aggravator was: Patterson's belief that if he testified against Perry, Perry would kill him;[75] and the nature of the crime itself. The State did not introduce evidence of prior crimes or unadjudicated offenses. We find

such evidence is insufficient to support this aggravating circumstance.

■ There is no evidence showing that Perry actually threatened Patterson. Rather, the State only introduced Patterson's belief that Perry would kill him if he testified against him. The subjective belief of Patterson, who suffered from a long history of mental health problems and drug abuse, is not sufficient to show that Perry constituted an actual threat to him or to anyone else. Moreover, the callousness of the crime in this case is not sufficient to show that Perry constitutes a continuing threat to society.[76] At most, the State proved an isolated act of violence committed by a man who suffered from severe drug and alcohol abuse. To establish "continuing threat" the State must show "a pattern of criminal conduct that will likely continue in the future." The facts of the crime in this case simply do not demonstrate such a pattern of criminal behavior.

While we do not minimize the shock and horror the community must feel about Rodgers' murder, the State legislature, in accordance with the dictates of the United States Supreme Court, has limited the circumstances under which the punishment of death may be imposed. We may not impose the death penalty under any other circum-

---

**72.** *Malone v. State*, 876 P.2d 707 (Okl.Cr.1994); *Smith v. State*, 819 P.2d 270, 277–278 (Okl.Cr. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 2312, 119 L.Ed.2d 232, *reh. denied*, — U.S. —, 113 S.Ct. 11, 120 L.Ed.2d 939 (1992).

**73.** *Malone*, 876 P.2d at 717.

**74.** *Id.*

**75.** Patterson testified, "If I would have snitched [Perry] out, he'd kill me" (Vol. III Tr. at 492) The prosecutor, referring to Patterson's March 30 statement to the police, also asked Patterson, "Do you recall a question—or your answer, 'Got home and he started telling me at the beginning, told me not to say anything. If I would have snitched him out, he would have killed me.' Do you recall that?" (Vol. III Tr. at 464) Patterson responded, "Vaguely." (Vol. III Tr. at 465)

**76.** The other cases in which this Court has found the callousness of the crime support the continuing threat aggravating circumstance are clearly distinguishable. *See Workman v. State*, 824 P.2d 378, 383–84 (Okl.Cr.1991), *cert. denied*, — U.S. —, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992);

*Battenfield v. State*, 816 P.2d 555, 566 (Okl.Cr. 1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992); *Sellers v. State*, 809 P.2d 676, 690 (Okl.Cr.), *cert. denied*, 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Boltz v. State*, 806 P.2d 1117, 1125 (Okl.Cr.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *Fox v. State*, 779 P.2d 562, 577 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); *Fowler v. State*, 779 P.2d 580, 588 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1537, 108 L.Ed.2d 775 (1990); *Fisher v. State*, 736 P.2d 1003, 1009 (Okl.Cr.), *aff'd on reh.*, 739 P.2d 523 (Okl.Cr. 1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933, *reh. denied*, 487 U.S. 1246, 109 S.Ct. 3, 101 L.Ed.2d 955 (1988); *Walker v. State*, 723 P.2d 273, 286 (Okl.Cr.), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986); *Ross v. State*, 717 P.2d 117, 123–24 (Okl.Cr.1986), *aff'd*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *Liles v. State*, 702 P.2d 1025, 1030–31 (Okl.Cr.1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732, *reh. denied*, 478 U.S. 1028, 106 S.Ct. 3341, 92 L.Ed.2d 749 (1986); *Robison v. State*, 677 P.2d 1080, 1088 (Okl.Cr.), *cert. denied*, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984).

stances. Here, the State failed to prove the two aggravating circumstances it charged. This failure requires us to modify Perry's death sentence. Accordingly, under our mandatory sentencing review of the record in this case,[77] we affirm Perry's conviction for first degree murder and modify his death sentence to life imprisonment without the possibility of parole.

LUMPKIN, LANE and STRUBHAR, JJ., concur.

JOHNSON, P.J., concurs in part/dissents in part.

JOHNSON, Presiding Judge, concurs in part/dissents in part:

I concur with the Court in affirming the judgment and the jury verdict in this case as to guilt. I would dissent from the Court's finding to modify to life without parole and, further, I would affirm the death sentence herein and affirm both aggravators.

The facts in this case are fairly clear. I would find circumstantial evidence to find the sufficiency of both aggravators. It would appear from the evidence that an abduction occurred between 9:45 and 10:00 p.m. on March 27, 1990. From other physical evidence, again, circumstances would warrant a jury finding that there was sufficient evidence to warrant heinous, atrocious and cruel as an aggravator. Appellant did not raise this issue, the issue that was raised had to do with the aggravator being inconsistently applied. Regardless, I would find that there was sufficient evidence to substantiate the aggravator.

This Court has consistently held in the past that evidence of the killing for which the defendant has been convicted can be enough to justify the continuing threat aggravator. The callous nature with which the deceased was killed, the way the body was dumped into the creek, the evidence of how appellant admitted the killing, are a basis for finding the aggravator. Therefore, based upon the past rulings of this Court and the evidence in this case, I would uphold the aggravator and the death sentence. *Workman v. State,* 824 P.2d 378, 383–84 (Okl.Cr.1991), *cert. de-*

nied, —— U.S. ——, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992).